**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

| | | |
|---|---|---|
| TAMMI RAND, | : | |
| | : | |
| Plaintiff, | : | Civ. No. 12-2137 (FLW) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| STATE OF NEW JERSEY,   et al., | : | |
| | : | |
| Respondents. | : | |

_____ :

**<u>WOLFSON, United States District Judge:</u>**

**I.      <u>INTRODUCTION</u>**

Before the Court is a Motion for Summary Judgment by Defendants George W. Hayman, William Hauck, Helen Adams, and Richard Salvatore (collectively "Defendants" or "Administrator Defendants") on Plaintiff Tammi Rand's ("Plaintiff's") Eighth Amendment and related state law claims against them.  Generally, Plaintiff contends that the Administrator Defendants failed to protect her from an attack by a fellow inmate, and that they denied her medical treatment for her injuries.  While many plaintiffs sue lower-ranking correctional officers when asserting a failure to protect claim, here, Plaintiff has chosen the more formidable path of seeking to hold the administrators liable instead.  Guided by the Third Circuit's most recent pronouncement on Eighth Amendment claims against supervisors, *Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 323 (3d Cir. 2014), the Court concludes that Plaintiff has partially succeeded in withstanding summary judgment on these difficult-to-sustain claims.

For the reasons explained herein, the Court grants in part and denies in part Defendants' motion.  Summary judgment is granted on the official capacity claims against all Defendants, and on Plaintiff's denial of medical care claim against Defendant Salvatore.  The Court also

1

grants summary judgment on Plaintiff's Eighth Amendment and state law claims against Defendants Hayman and Salvatore, but denies summary judgment on these same claims against Defendants Hauck and Adams because there exist genuine issues of material fact.  Finally, the Court concludes that Defendants Hauck and Adams are not entitled to qualified immunity at this juncture, and the Court denies summary judgment on Plaintiff's punitive damages claims against these defendants.

## II.     FACTUAL BACKROUND

Because the Court is considering the facts in the context of Defendants' Motion for Summary Judgment, the Court views the facts in the light most favorable to Plaintiff.[1]

On February 6, 2010, Plaintiff was a prisoner at the Edna Mahan Correctional Facility for Women ("EMCFW"), serving a sentence for first-degree robbery. (Ex. A to Defendants' Statement of Undisputed Material Facts at T.RAND 4059 (hereafter "SOMF").) While in a common area of the EMCFW, Plaintiff was assaulted by inmate Tyleaka Price, who boiled a mixture of water, black pepper, cayenne pepper, and hot sauce in a microwave for 10 minutes to an hour, depending upon the account (*see* Pl. Ex. B), and then proceeded to hurl the scalding water at Plaintiff, who sustained second-degree burns from the attack and is permanently scarred.

---

[1] Plaintiff has made the Court's task much more difficult in this regard by failing to comply with Fed. R. Civ. P. 56(c)(1)(A) and L. Civ. R. 56.1(a).  Specifically, "Plaintiff's Answer to Defendant's [sic] Statement of Undisputed Material Facts" consists of numbered paragraphs that merely admit or deny the statements in Defendants' paragraphs and fail to rebut the disputed facts, as required by Fed. R. Civ. P. 56(c)(1)(A) and L. Civ. R. 56.1(a).  Plaintiff's brief also contains numerous unsupported factual assertions and selective citation to the record.  Although I am required to consider only cited materials in rendering my decision, *see* Fed. R. Civ. P. 56(c)(1)(B)(3),  I have considered the entire record submitted by the parties.  *Id.*

After the attack, Inmate Price was criminally charged for the incident and subsequently plead guilty. (SOMF ¶ 40; Dkt. No. 37-18 [Ex. O, Plea Transcript for Tyleaka Price].)

The events leading up to the assault are as follows.  In January 2010, Plaintiff was assigned to the medium custody compound at EMCFW and was housed in Hillcrest. (SOMF ¶ 21 [T.Rand53].)[2]  At that time, Price was newly assigned to medium custody and was also assigned in Hillcrest. (SOMF ¶ 22 [Ex. E, Deposition of Plaintiff Tammi Rand ("Pl. Dep. Tr."), 29:17-24].)  Hillcrest is further divided into two separate housing units, Hillcrest North and Hillcrest South; inmates assigned to one are not permitted to enter the other.  (SOMF ¶ 23 [Ex. I Decl. Hauck].)  At the time of the attack, Plaintiff was assigned to Hillcrest South and inmate Price was assigned to Hillcrest North. (SOMF ¶ 24 [Pl. Dep. Tr. at 90:18-25].)

Although inmates assigned to one housing unit are not permitted to enter other housing units, inmates assigned to the medium/maximum compound may still interact with one another, regardless of housing and custody status, in several common areas.  These areas include the dining hall, recreation yard, gym, chapel or religious services, classrooms, as well as the hallways to and from classrooms. (SOMF ¶ 11 [Ex. I, Decl. Hauck, ¶20].)  Price's assault on Plaintiff occurred in a common area.

---

[2] EMCFW is the only correctional facility for women in the State of New Jersey. (SOMF at ¶ 3 [Ex. I, Declaration of William Hauck "Decl. Hauck", ¶5].)  EMCFW has inmates at various levels of custody ranging from minimum custody to maximum custody. (SOMF at ¶ 4 [Ex. J, Declaration of Richard Salvatore "Decl. Salvatore" ¶4].)  Inmates at EMCFW who are assigned minimum status are housed in a completely different compound that is physically separated from inmates assigned to custody levels of gang-minimum, medium, and maximum custody levels. (SOMF at ¶ 5 [*Id.*].)  Inmates assigned to custody levels of gang-minimum, medium, and maximum are all housed in one compound, the medium/maximum compound. (SOMF at ¶ 6 [*Id.*].)

Plaintiff and Price had no interactions with one another prior to January 2010, (SOMF ¶ 25 [Pl. Dep. Tr. 22:24-25, 23:1-10].), but inmate Price began to threaten Plaintiff approximately three weeks prior to the February attack.  (Pl. Dep. Tr. at 25:10-15.)  Price's threats against Plaintiff were precipitated by the fact that Plaintiff had become romantically involved with another inmate with whom Price was also romantically involved. (*Id.* at 22:24-25; 23:1-10.)

Although her testimony is not a model of clarity, Plaintiff testified that Price specifically threatened to attack her:

> Q:     Okay.  Did Miss Price, when she was walking around saying things, did she ever say she was going to attack you?
>
> A:     Yes.  She said:  I am a ticking time bomb, I don't have nothing to live for, I'm dying, if I take another bitch with me, then it's all the more because I'm going to get her, I'm going to get her. And not only did I inform the officers, but other people on her wing was informing them, Patricia Crawford, Paula Calhoun, Valerie Sills. They all came in and told the officers like: she's walking around here every day threatening the girl.
>
> Q:     Okay.  Did she ever refer to you by name or referring to –
>
> A:     Yes, she did.  She calls me Star.  That's my nickname.
>
> Q:     She said I am going to get Star?
>
> A:     Absolutely.

(Pl. Dep. Tr. 28:3-21.)  Plaintiff further testified that when she walked by Price, Price would make threats such as "Bitch, like I am going to get your ass."  (Pl. Dep. Tr. 29:25-30:8.)

The parties dispute whether Price had a longstanding history of violence prior to the assault on Plaintiff.  Plaintiff contends that Price was a "legend" among inmates, officers, and administrators at EMCFW (Pl. Dep. Tr. 17:5-18:14; Dkt. No. 43, Br. at 11), and had a reputation as a violent inmate who had committed numerous assaults on other inmates while incarcerated at

EMCFW.[3]  (*Id.*)  Plaintiff personally witnessed only one fight that involved Price that occurred six months after Plaintiff's arrival at EMCFW.  (*Id.* at 17:25-18:14.)

Officer Vincent Grossi, who was on duty when Price assaulted Plaintiff but is not named as a defendant in the instant suit, testified that officers had concerns about Price's potential for violence but indicated no administrators had ever talked to him about Price's violent potential. (Grossi Dep. Tr. 27:22-28:3.) When asked if it was "common knowledge" among the inmates and officers that Price "was violent and had injured other inmates" prior to the assault on Rand, Grossi acknowledged that "[t]here were rumors of her being that way."  (Grossi Dep. Tr. 100:22-101:2.)  Plaintiff's prison psychologist Aron Steward, who is also not named as a defendant, testified that "it was stated around the institution from correctional officers and inmates that [Price] had a violent history," but she could not recall which inmates or correctional officers had made such a statement, or whether administrators had made that statement as well.  (Steward Dep. Tr. 40:2-21.)

In this vein, Plaintiff further contends that Price should not have been housed with the general population at EMCFW due to her violent propensities.  In support of this position she testified that when she told Steward about her fear of Price before the assault, Steward shared with Plaintiff the fact that she told the administration that Price was not ready to be in the general population (Pl. Dep. Tr. 82:3-13.)  Steward, however, testified that she did not recall having any conversations with Plaintiff about Price, or about making any recommendations about Price's

---

[3] According to the record, at least some of the rumors surrounding Price's violent history were tall tales.  For example, although Price's original conviction was for robbery, (*See* State of New Jersey Offender Database, inmate details, available at https://www6.state.nj.us/DOC_Inmate/ details?x=1039337&n=0), fellow inmate Paula Nielly Calhoun, who sustained minor burns during the attack on Plaintiff, testified that Price was incarcerated at EMCFW because "she cut her sister's stomach open and killed her unborn fetus." (Calhoun Dep. Tr. 22:14-17; 24:20-25.)

housing assignment.  (Steward Dep. Tr. 22:9-24:12.)  Steward further testified that she did not transmit information directly to prison administrators or participate in classification meetings but instead made recommendations to her supervisors who would then transmit those recommendations to the classification committee.  (Steward Dep. Tr. 22:9-24:12; 27:18-25; 28:1-16.)  Additionally, Inmate Calhoun testified that an unnamed nurse at EMCFW that treated Calhoun's burns after the assault also told her that it was "messed up" that Price was allowed in the regular population at EMCFW and that Price had previously harmed other inmates. (Calhoun Dep. Tr. 28:6-29:13.)

As noted above, the only individual Defendants in this suit are administrators and former administrators at EMCFW.  In February 2010, Defendant Hayman had just retired as Administrator of the New Jersey Department of Corrections.  Defendant Hauck was the Administrator at EMCFW, Helen Adams was the Assistant Administrator at EMCFW, and Defendant Salvatore was the Associate Administrator EMCFW. (*See* Defendants' individual answers to interrogatories, ¶ 5.)

With the exception of Defendant Salvatore, Defendants deny having any knowledge of prior assaults by Price.  Defendant Salvatore recalls only one other incident involving inmate Price in which she attacked another inmate with a can of beans, and recalled that "inmate Price was provoked in a significant way (that is, taunted using racial epithets)" by the inmate she attacked.  (SOMF ¶ 34. [Ex. M Salvatore Answers to Interrogatories ¶ 19])  Defendant Hayman retired on January 15, 2010, prior to the assault on Plaintiff.  He avers that he has no knowledge of the incident, nor of any prior violent history of Inmate Price. (*See* SOMF ¶ 35 [Ex. K, Hayman's Answers to Interrogatories]).  Defendants Hauck and Adams likewise aver that they

had no prior knowledge of any assaults by Inmate Price. (*See* SOMF 36 [Ex. L, Adam's Answers to Interrogatories; Ex. N, Hauck's Answers to Interrogatories].)

Plaintiff testified at her deposition that she told everyone at the prison, from officers to the administrators, that Price was a "ticking time bomb," a term Price used to describe herself. (Pl. Dep. Tr. 87:2-9.)  Importantly, Plaintiff testified that she had the opportunity to talk directly with Adams and Hauck about her fears because they regularly walked around the compound and interacted with inmates.  (Pl. Dep. Tr. 27:2-24.)[4]  Another inmate, Lisa Johnson, also testified that both Adams and Hauck walked around the prison and interacted with the inmates.  (Johnson Dep. Tr. 42:1-43:14.)

According to Plaintiff, during two of her interactions with Adams, Plaintiff informed Adams that she feared Price, and that Price was threatening her:

> Q:     Did you say you spoke with Miss Adams?
>
> A:     Yes, I spoke to Miss Adams twice before the incident.
>
> Q:     And what did you tell her?
>
> A:     I told her that I did not want to be in there.  I told her that I was scared of [Price], I didn't know what was going to happen, that [Price] kept threatening me.
>
> And my – my response from all of them at that time was: Tammi until she does anything our hands are tied.  We are going on your word and your words alone.

(Pl. Dep. Tr. 32:25-33:11.)  Plaintiff further testified that she had a conversation with Adams about Price in which they discussed Price's alleged HIV status.  (Pl. Dep. Tr. 87:10-23.)  During

---

[4] In terms of timing, Defendants contend in their brief (without citation to the record) that Plaintiff spoke with Defendants Adams and Hauck two weeks prior to the attack. (Def. Br. at 21.)  Although Plaintiff is clear that she spoke with these Defendants prior to the attack, her deposition testimony is not clear as to the exact timing of her talks with these two Defendants.

that conversation, Adams told Plaintiff that "[Price] is dealing with a lot of personal issues right now.  She'll be all right, just leave her alone, stay away from her."  (Pl. Dep Tr. 32:25-33:11.)

Plaintiff testified that Hauck also walked around the prison and met with inmates and that she also spoke directly with Hauck about her fear of Price, but that Hauck and Adams both told her that "they could not do anything until [Price] did something.  Their hands were tied."  (Pl. Dep. Tr. 78:10-23.) Plaintiff testified that she told Hauck that Price should not be in the general population at Hillcrest:

> Q:      What did Hauck tell you about – or tell you in response to your complaint that Tyleaka Price should not be placed in the general population at Hillcrest?
>
> [Objections omitted]
>
> A:      He said something about –
>
> Q:      What did he tell you?  Did he tell you –
>
> A:      He said it was out of his hands.  They were aware of the problem.  It was out of his hands.  And until she did something, there was nothing he could do about it.

(*Id.* at 86:15-87:1.)[5]

Plaintiff testified that she spoke to others, in addition to Administrators Adams and Hauck, about her fear of Price.  According to Plaintiff, everyone she spoke to acknowledged Price's mental health issues and history of assault, but indicated that nothing could be done absent some action by Price:

> Q:      Did you talk – before this attack, had you talked to Officer Grossi about your relationship and fear of – or to Miss Price?

---

[5]  Inmate Calhoun, like Rand, offered testimony, albeit vague, that prison officials did not act on an inmate's complaint about another inmate until "something happened" and that prison officials were reactive rather than proactive.  (Calhoun Dep. Tr. 54:15-55:5.)

> A:      Yeah, I talked to [Officer] Grossi.  I talked to all of them. And they all told me the same thing.
>
> Q:      Which was?
>
> A:      Was watch out for her, she's crazy, she's known for assaulting people, and unfortunately until she does something or we see her do something, we can't do anything for you about it.
>
> Q:      Does that also apply to the defendants that we've sued here, Mr. Hauck, Miss Adams and Mr. Salvatore?
>
> A:      Yes.
>
> Q:      Any doubt of that?
>
> A       No, none whatsoever.[6]

(Rand Dep. Tr. 92:1-13.)  Somewhat contradictorily, Plaintiff also testified that at least one other inmate who complained about Price was moved out of the unit shortly before the attack.  (Pl. Dep. Tr. 78:10-79:18.)

Defendants have laid out in detail EMCFW's official policies and procedures for using classification, mishousing, and custody to avoid conflicts among inmates. (SOMF ¶¶ 14-19.) Defendants further aver that Plaintiff has, on other occasions, been "intentionally mishoused" to address concerns about her safety. [7]  (SOMF ¶¶13, 20.)

---

[6]  Plaintiff subsequently corrected herself and stated that she did not speak to Salvatore prior to the incident and only spoke to Adams and Hauck, and indicated that she assumed that Salvatore knew about Price's history by virtue of his position as Associate Administrator. (*Id.* at 92:19-94:23.)

[7] According to Defendants, although inmates may be "intentionally mishoused," whereby the inmate is placed in a different housing unit or custody level due to threats from another inmate, inmates that are at either maximum or minimum custody cannot be intentionally mishoused to be placed in minimum custody due to security and safety concerns. (SOMF ¶¶ 14-19.) Inmates can however be placed in protective custody and may request such a designation should they feel threatened by other inmates. (SOMF ¶¶ 17-18 [Id. at ¶¶21-29; Decl. Hauck ¶3, Ex. B which is a

In response to Plaintiff's deposition testimony that she spoke to Defendant Hauck prior to the attack and told him that Price was threatening her, Hauck has submitted a declaration, which states: "I have no recollection of ever speaking to inmate Rand regarding her feeling threatened by Inmate Price." He further states that "[h]ad such a fear for her safety been made known to me, Rand would have been placed in protective custody until the legitimacy of her threat could be determined." (Hauck Decl. ¶¶ 40-41.) Inmate Johnson, however, testified that before Price attacked Plaintiff, Johnson told Hauck that Johnson was afraid of Price and asked him why she was "in this population." (Johnson Dep. Tr. 42:1-43:14.) In response, Hauck allegedly stated that he was aware of the "situation" with Price and knew Price "personally" and was "handling" it. (*Id.* at 43:15-44:17; 47:3-7.) Johnson testified that she did not believe that Hauck was going to do anything. (*Id.* at 48:4-8.)

Defendant Adams has not submitted a declaration or otherwise disputed Plaintiff's testimony that Plaintiff told Adams prior to the attack that Price was threatening her. Adams' individual interrogatory answers aver that Adams was not at work when Price assaulted Plaintiff and that she did not learn about the actual *assault* until she returned to work on February 8, 2010. (Ex. L., Adams' Answers to Interrogatories ¶ 4.) Neither the interrogatories nor Adams' answers, however, address Plaintiff's testimony that Plaintiff told Adams about Price's threats prior to the assault.

In addition to allegedly speaking with Adams and Hauck directly, Plaintiff filed an inmate remedy form to be reassigned to minimum custody approximately two weeks prior to the assault in January 2010. (*See generally* Pl. Dep. Tr. 25:25-31:23.) Plaintiff's understanding was

---

copy of the Inmate Handbook at T.Rand4152].) It is undisputed that Plaintiff did not request to be placed in protective custody. (Pl. Dep. Tr. 26:13-24.)

that the request would be delivered to Adams and Hauck, but she did not see the form handed to either of them. (Pl. Dep. Tr. 25:25-27:13; 50:13-52:18.)  Plaintiff testified that she did receive a visit from an Officer Johnson in response to the inmate remedy form, and Officer Johnson told her that "administration" sent him to talk to her but that nothing could be done until Price did something.  (*Id.* at 25:25-27:11; 32:2-8.)  Plaintiff was not satisfied with the response and sent another inmate remedy form addressed directly to Adams (*Id.* at 32:7-24.)  According to Plaintiff, the assault occurred, however, before she heard anything back, and she does not know if Adams ever received the remedy form. (*Id.*)

It is undisputed that Price violated a 2005 policy directed at inmates that prohibited the heating of liquids in the microwave. (SOMF ¶ 32; Def. Ex. D.)  That memorandum was posted in the common dining areas of the medium/maximum housing compound. (SOMF ¶ 33 [Decl. Hauck ¶6].)  According to Plaintiff's deposition testimony, the microwave policy had been inconsistently enforced by officers. (Pl. Dep. Tr. 106:3-108:17.)  Plaintiff testified that sometime in 2006, prior to Price's assault, Rand was written up for using the microwave to heat up coffee. *Id.*  Inmate Calhoun testified that some officers allowed the inmates to heat up water and others did not, and she had never been told that she could not heat up water. (Calhoun Dep. Tr. 16:5:17:1.)  Defendants aver that officers are expected to monitor inmates' use of microwaves in the same manner as officers monitor those inmates elsewhere in the unit, but they are not expected to prevent every incident.  (Hauck Interrogatory Answers ¶16)

Between the issuance of the memo in 2005 and Price's assault on Plaintiff, there were two similar attacks on inmates involving scalding liquids that had been heated in the microwave. (Pl. Dep. Tr. 66:23-69:19; Calhoun Dep. Tr. 18:5-21:6.)  It is undisputed that none of these assaults involved inmate Price.

11

Dr. Aron Steward testified that the microwave served an important function for inmates at EMCFW.

> Q:     Just one follow-up question, Doctor.
>
>        If you don't know the answer, that's fine, but are you aware if the reasons, if there were any, why there were microwaves available for inmates in at least the medium and minimum facilities at Edna Mahan Prison during the time period that we're dealing with here?
>
>        In other words –
>
> A:     They were –
>
> Q:     In other words, why were the microwaves made available for inmates if you know?
>
> A:     Yeah.  No one ever specifically explained it to me, but what I will say is that the inmates talked consistently and profusely about the importance of being able to cook their own food.
>
>        I am not sure if it played a role.  No one ever explained it to me, but that was certainly a topic of conversation daily from the inmates.
>
> Q:     Meaning, that they – it's fair to say, your understanding from the inmates is that they were happy to have the microwave available?
>
> A:     Yes.  They – they found it profoundly comforting to be able to cook food together.

(Steward Dep. Tr. 75:18-76:15.)

Plaintiff also contends that she was mistreated after the assault and when she returned to EMCFW.  According to her deposition testimony, Plaintiff was initially handcuffed by officers after Price attacked her. It is undisputed that Plaintiff was then transported by helicopter to Saint Barnabas Hospital in Livingston, New Jersey, where she treated for her burn injuries.  Plaintiff was returned to EMCFW that night. (Pl. Dep. Tr. 102:10-18.)  Plaintiff testified at her deposition

that, upon her return, Plaintiff was assigned to Price's empty bed in Hillcrest North even though her own bed in Hillcrest South was still open.  (*Id.* at 100:2-102:18.)  Plaintiff refused the bed assignment and became emotionally distraught at which point Officer Harris, also not named as a defendant, threatened to have her maced and put in solitary confinement. (Pl. Dep. Tr. 80:10-83:3.)  Because she threatened to kill herself, Plaintiff was placed in the Suicide Unit but was returned to her original bed the next day after meeting with Adams and Hauck.  (Pl. Dep. Tr. 80:10-83:3; 90:5-91:24.)  Plaintiff also received a disciplinary charge for refusing the bed assignment.  (Grossi Dep. Tr. 39:23-40:14.)

Officer Grossi testified at his deposition that he was in charge of assigning Plaintiff to Price's empty bed and did so because Hillcrest North, the housing unit to which she was reassigned, was full.  (Grossi Dep. Tr. 36:13-37:8.)  In response to questioning from counsel, Grossi agreed that the decision to reassign Plaintiff to a different housing unit (from Hillcrest South to Hillcrest North) would have come from the administrators, *i.e.*, Hauck, Adams, or Salvatore. (Grossi Dep. Tr. 41:10-43:17.)

Finally, Plaintiff spoke with Defendant Salvatore and requested cocoa butter lotion and Dove soap, which were "prescribed" for her burn injuries by doctors at Saint Barnabas.  She followed up by making the same request to Salvatore in writing.  (Def. Ex. J at ¶¶ 3-4, Ex. A to Salvatore Decl.)  Defendant Salvatore told Plaintiff that these items could not be filled through the pharmacy but could be purchased through the commissary. (Pl. Dep. Tr. 33:12-24.)  Salvatore contends that he spoke to a physician at EMCFW before denying Plaintiff's request for these items.  (Def. Ex. J at ¶¶ 3-4.)

# III.   ANALYSIS

## A.  Standard of Review

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law."  *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir.2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor .'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 447 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002).

The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment.  *Celotex*, 477 U.S. at 330.  "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg.*, Inc., 243 F.3d 130, 138 (3d Cir. 2001).  The non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005) (quotations omitted).  Under

14

*Anderson*, Plaintiffs' proffered evidence must be sufficient to meet the substantive evidentiary standard the jury would have to use at trial. 477 U.S. at 255.  To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324 (quotations omitted); *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokle*y, 172 F.3d 238, 252 (3d Cir. 1999).  In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249.  Credibility determinations are the province of the factfinder.  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

### B.  Official Capacity Claims Against Defendants

The Defendants first argue that Plaintiff's § 1983 claims against them in their official capacities should be dismissed.  I agree.  The United States Supreme Court has made clear that suits against state government officials in their official capacities should be treated as suits against the state itself.  *See Hafer v. Melo*, 502 U.S. 21, 25–27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").  In *Will v. Michigan Dept. of State Police*, the Supreme Court of the United

States held that "neither a State nor its officials acting in their official capacities are "persons" under § 1983.  As explained by the Court, "[o]bviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. *Id.* (citing *Brandon v. Holt*, 469 U.S. 464, 471, 105 S.Ct. 873, 877, 83 L.Ed.2d 878 (1985). As such, it is no different from a suit against the State itself. *Id.* (internal citations omitted).  Accordingly, I will grant the Defendants' request for summary judgment on the official capacity claims against them.

### C. <u>Eighth Amendment Conditions of Confinement Claims</u>

Plaintiff's remaining claims against the individual Defendants rely on a number of theories but are all grounded in the violations of the Eighth Amendment. [8]   "The Eighth Amendment's prohibition on 'cruel and unusual punishment' ... imposes on [prison officials] a duty to provide 'humane conditions of confinement." *Betts v. New Castle Youth Development*, 2010 WL 3528902, at *4 (3d Cir. Sept. 13, 2010) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

---

[8] To the extent that Plaintiff raises state law claims mirroring her § 1983 claims, those state claims will be addressed in tandem with her federal causes of action.  *See Trafton v. City of Woodbury*, 799 F.Supp.2d 417, 443–44 (D.N.J. 2011); *see also Chapman v. New Jersey*, No. 08–4130, 2009 U.S. Dist. LEXIS 75720, at *7, 2009 WL 2634888 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart...."); *Armstrong v. Sherman*, No. 09–716, 2010 U.S. Dist. LEXIS 55616, at *15, 2010 WL 2483911 (D.N.J. Jun. 4, 2010) ("[T]he New Jersey Civil Rights Act is a kind of analog to section 1983 ...."); *see generally Hedges v. Musco*, 204 F.3d 109, 122 n. 12 (3d Cir.2000) (concluding that New Jersey's constitutional provisions concerning search and seizures are interpreted analogously to the Fourth Amendment).

1.  **Failure to Protect**

Plaintiff first alleges that the individual Defendants are liable for failing to protect her from Price's assault.  Under the Eighth Amendment, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners."  *Farmer*, 511 U.S. at 832 (quoting *Cortes–Quinones v. Jimenez–Nettleship*, 842 F.2d 556, 558 (1st Cir.1988)) (internal quotation marks and ellipses omitted). "While '[i]t is not ... every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for a victim's safety,' '[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.'" *Hamilton v. Leavy*, 117 F.3d 742, 747 (3d Cir.1997) (quoting *Farmer*, 511 U.S. at 834).

The Eighth Amendment imposes "a duty upon prison officials to take reasonable measures to protect prisoners from violence at the hands of other prisoners." *Hamilton*, 117 F.3d at 746.  To establish a failure to protect claim, an inmate must demonstrate that: (1) he or she is "incarcerated under conditions posing a substantial risk of serious harm;" and (2) the prison official acted with "deliberate indifference" to his or her health and safety.  *Farmer*, 511 U.S. at 834.

A prisoner satisfies the first element of the test when the alleged "punishment" is "objectively sufficiently serious." *Hamilton*, 117 F.3d at 746 (quoting *Farmer*, 511 U.S. at 834). A substantial risk of serious harm "'may be established by much less than proof of a reign of violence and terror,' but requires more than a single incident or isolated incidents." *Blanchard v. Gallick*, 448 Fed. App'x 173, 177 (3d Cir. 2011) (quoting *Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir.1985)).  The standard does not require that an inmate must suffer an assault before obtaining relief. *Id.*

Deliberate indifference requires that an official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. "The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Beers–Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir.2001); *see also Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 323 (3d Cir. 2014); *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012). A plaintiff meets her burden of establishing the defendant's actual knowledge of serious risk "in the usual ways, including inference from circumstantial evidence." *Farmer* 511 U.S. at 842, 114 S.Ct. 1970. Thus, in some instances, "[a] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Beers-Capitol*, 256 F.3d at 131 (citing *Farmer*, 511 U.S. at 842, 114 S. Ct. 1970).

As noted *infra*, Plaintiff proceeds only against high-ranking prison administrators. "It is well-recognized that '[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.'" *Barkes*, 766 F.3d at 316-17 (citing *Bistrian*, 696 F.3d at 366) (alteration in original). Instead, they are "liable only for their own unconstitutional conduct." *Id.* The Third Circuit in *Barkes* reiterated "the two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates [:]" (1) establishing a policy, custom, or practice that caused the harm; or (2) directly participating in the constitutional violation. More specifically,

> [f]irst, liability may attach if they, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)).

18

> Second, "a supervisor may be personally liable under § 1983 if he
> or she participated in violating the plaintiff's rights, directed others
> to violate them, or, as the person in charge, had knowledge of and
> acquiesced" in the subordinate's unconstitutional conduct. *Id.*
> (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190–91 (3d Cir.
> 1995)).

*Id.*

The plaintiff's theories as to how the Defendants' actions and inactions constitute deliberate indifference include allegations of both types of liability.  Regarding the first type of liability, Plaintiff argues that Defendants are liable in a supervisory capacity for implementing deficient policies regarding use of the microwave, which had been weaponized on previous occasions, and for promulgating a "reactive" policy or custom in responding to threats of inmate assault—one that waited for attacks to occur before taking action.  As for direct liability, the second type, Plaintiff contends that all the Administrator Defendants knew of a longstanding and obvious threat to inmate safety presented by Price, who allegedly had a lengthy history of assaulting other inmates.  She further contends that Defendants Adams and Hauck are liable for failing to protect her from Price's assault because she told each Defendant on more than one occasion that she was afraid of Price and that Price was threatening to harm her.  I address each of her theories of liability separately, starting with the direct participation theory.

### a.   Direct Participation

Here, for purposes of summary judgment, Plaintiff satisfies the objective element of the failure-to-protect test.  She has presented sufficient evidence from which a jury could conclude that Price's repeated and escalating threats against her in two weeks leading up to the attack posed a substantial risk of serious harm to Plaintiff.

However, as for the subjective element of the test, Plaintiff has not presented sufficient admissible evidence that Price's reputation for violence or her actual history of assault made it "so obvious" that Defendants must have known of a general risk presented by Price.  Even assuming the admissibility of testimony by inmates, officers, and a prison psychologist that Price had a reputation as a violent inmate, there is no evidence that Price's reputation for violence was either known to the Defendants or was so obvious and longstanding that it must have been known to them.  *See, e.g., Farmer*, 511 U.S. at 842-43 (explaining that actual knowledge may be inferred where "a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past").  Plaintiff's evidence regarding Price's history of violence is scant and, likewise, does not create the inference that the Defendants must have known that Price presented a threat to inmates in general or Plaintiff in particular.

Although Plaintiff does not present sufficient admissible evidence that Price posed such a pervasive or obvious threat to infer that the all the Administrator Defendants were inevitably aware of the threat, that inference is not necessary to survive summary judgment as to Defendants Adams and Hauck because Plaintiff claims that she informed Adams and Hauck of the specific threat that Price posed to her safety.  As noted above, Plaintiff testified in her deposition that she spoke with Adams and Hauck prior to the attack, and that she communicated her fear to them.

Defendants contend that Plaintiff's alleged conversations with Adams and Hauck about Price are too general or vague to raise the inference that Adams and Hauck were deliberately indifferent to the risk posed by Price.  Defendants further contend that Eighth Amendment liability for failure to protect must be based on what Defendants actually knew about the threat

posed by Price not what they should have known or concluded about that threat.  (Def. Br. at 15-16.)

The Third Circuit has addressed the types of complaints that are too general or vague to raise the inference that a prison official was aware of a risk of substantial harm.  In *Counterman v. Warren County Corr. Facility*, 176 F. App'x 234, 237-239 (3d Cir. 2006), the plaintiff presented evidence that several prison officers knew that he was the target of harassment and aggression by several inmates prior to the attack and thus had the requisite knowledge for deliberate indifference.  The Third Circuit, in upholding the district court's grant of summary judgment, found that evidence that inmates bragged to prison guards about their mistreatment of plaintiff and that the officers told Plaintiff "not to take it" and to "fight back" was insufficient to raise the inference that the officers were actually aware of an excessive risk to plaintiff's safety.  The Court determined that "[t]he inmates' boasts conveyed harassment and unpleasantness" but "did not lead to the inference that [the officer] must have known of an intolerable danger to [Plaintiff] that would evince an Eighth Amendment violation."  *Id.* at 239.  The Court noted however that another portion of deposition testimony which made clear that inmates specifically bragged to officers about "harassing and *beating up on*" plaintiff, lent more credence to plaintiff's position, but declined to consider it because the plaintiff had not submitted the testimony below.  *Id.* at 239 fn 1 (emphasis in original).

Similarly, in *Jones v. Beard*, 145 F. App'x 743, 745 (3d Cir. 2005), the Third Circuit held that prison guards did not have actual knowledge of a threat of serious harm to an inmate in part because the inmate had not "articulated specific threats of harm" to the prison official.  *See also Blackstone v. Thompson*, 568 F.App'x 82, 84–85 (3d Cir.2014) (no liability where plaintiff "had just one communication" with prison official, in which Plaintiff "stated that he was not 'getting

along' and did not 'feel comfortable' with his cellmate"); *Bizzell v. Tennis*, 449 F.App'x 112, 115 (3d Cir.2011) (plaintiff's complaints to prison officials that his eventual attacker was unstable and trying to set him up found insufficient to raise a significant risk of serious harm where plaintiff did not complain about threat to his safety).

Unlike in *Counterman* and *Jones*, Plaintiff here alleges that she told Defendants Adams and Hauck directly on more than one occasion in the weeks leading up to the attack that she feared Price because Price was behaving erratically and threatening to harm her. She also asserts that "everyone" to whom she complained acknowledged that Price was dangerous. In this case, the finder-of-fact could conclude that Plaintiff "articulated specific threats of harm" to Adams and/or Hauck, and that one or both of these Defendants had subjective knowledge of the risk facing Plaintiff. *Accord Nicholas v. Carter*, 736 F.Supp.2d 866, 872 (D.Del. 2010) (denying summary judgment for failure to protect where plaintiff testified that he directly communicated his fear of assailant to prison official and prison official admitted having knowledge of assailant's history to Plaintiff).

I do not draw any conclusions about whether Plaintiff's evidence will convince a jury that either Adams or Hauck actually knew of and disregarded an excessive risk to Plaintiff's safety. Indeed, some of Plaintiff's testimony about her interactions with Adams suggest that Adams was *not* subjectively aware of the risk presented by Price's threats against Plaintiff and, instead, suggests that Adams minimized the threat presented by Price. For instance, according to Plaintiff, on one occasion, Adams told her: "[Price] is dealing with a lot of personal issues right now. She'll be all right, just leave her alone, stay away from her." (Pl. Dep Tr. 32:25-33:11.) It is notable, however, that neither defendant categorically denies speaking with Plaintiff about her fear of Price. Adams does not offer any rebuttal to Plaintiff's testimony that Plaintiff told Adams

that Price was threatening to harm her, and Hauck's declaration merely states that he has "no recollection of ever speaking to [Plaintiff] regarding her feeling threatened by Inmate Price." (Hauck Decl. ¶¶ 40.)

In contrast, Plaintiff has not presented credible evidence that Defendants Hayman or Salvatore had the requisite knowledge that Price presented a substantial risk of harm to inmates generally, or to Price in particular.  It is undisputed that Plaintiff did not speak to Defendant Salvatore prior to the incident about her fear of inmate Price. (Pl. Dep. Tr. 92:19-24.)  Nor does she contend that she spoke with Defendant Hayman who had retired prior to the assault in January 2010.  As such, Plaintiff's failure to protect claims premised on Defendants' deliberate indifference to the threat presented by Price must be dismissed as to Defendants Hayman and Salvatore.

Plaintiff's contention that corrections officers mistreated her after the assault likewise do not raise the inference that any of the Administrator Defendants had the requisite personal involvement in order to render them liable in a supervisory capacity.  "To establish knowledge and acquiescence of a subordinate's misconduct, a plaintiff must allege the defendant's (1) contemporaneous knowledge of the offending incident or knowledge of similar incidents in the past, and (2) actions or inactions which communicated approval of the subordinate's behavior." *Bornstein v. County of Monmouth*, No. 11-5336, 2014 WL 6908925, at *2 (D.N.J. Dec. 9, 2014) (citing *Broadwater v. Fow*, 945 F.Supp.2d 574, 588 (M.D. Pa. 2013) ("A plaintiff may not allege that a supervisory defendant had constructive knowledge of a subordinate's unconstitutional conduct simply because of his role as a supervisor.")).  Although it is certainly troubling that Plaintiff was handcuffed after she was assaulted by Price, was assigned to Price's bed upon her return to EMCFW, and was threatened with mace and solitary confinement for refusing to accept

the bed assignment, these actions were taken by non-party corrections officers, and there is no evidence that any of the Defendants directed or acquiesced in this conduct or similar acts. Speculation that someone in administration must have transferred Plaintiff to Hillcrest North is likewise insufficient to defeat summary judgment where there is no evidence that any of the individual Defendants had knowledge that Plaintiff would be assigned to Price's former bed.  As such, these post-assault incidents, though unfortunate, cannot form the basis for the Defendants' liability.

### b. Policy, Custom, or Practice

Because Plaintiff also asserts theories of liability that focus on the Defendants' respective roles as policymakers, I next assess whether Defendants are liable for implementing deficient or illegal policies.  The Third Circuit has recognized that deliberate indifference claims implicating supervisors for their deficient policies are more complicated than direct deliberate indifference claims, because the former add another level to the analysis.  *Beers-Capitol*, 256 F.3d at 133. The Third Circuit in *Barkes* recently reiterated that *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989), provides the analytical framework for assessing Eighth Amendment claims against a supervisor for failing to supervise and/or for implementing deficient policies:

> To hold a supervisor liable for such an Eighth Amendment
> violation, the plaintiff must identify a supervisory policy or
> procedure that the supervisor defendant failed to implement, and
> prove that: (1) the policy or procedures in effect at the time of the
> alleged injury created an unreasonable risk of a constitutional
> violation; (2) the defendant-official was aware that the policy
> created an unreasonable risk; (3) the defendant was indifferent to
> that risk; and (4) the constitutional injury was caused by the failure
> to implement the supervisory procedure.

766 F.3d at 330; *id.* at 317.  As explained by the Court in *Barkes*, "[t]he essence of the type of clam we approved in *Sample* is that a state official, by virtue of his or her own deliberate

indifference to known deficiencies in a government policy or procedure, has allowed to develop an environment where there is an unreasonable risk that a constitutional injury will occur, and that such an injury does occur." 766 F.3d at 319-20. Thus, deliberate indifference in the supervisory context may be demonstrated by "(i) showing that a supervisor failed to adequately respond to a pattern of past occurrences of injuries like the plaintiff ['s) or (ii) by showing that the risk of constitutionally cognizable harm was 'so great and so obvious that the risk and the failure of supervisory officials to respond will alone' support the finding that the two-part test is met." *Beers-Capitol*, 256 F.3d at 136-37 (citing *Sample*, 885 F.2d at 1099).

Here, Plaintiff argues that the microwave policy and the practices for monitoring inmates' use of the microwave were deficient, given the prior abuses of the microwave, and that this deficiency created an unreasonable risk of a constitutional violation. It is undisputed that the prison instituted a microwave policy in 2005 that prohibited inmates from heating water in the microwave. Defendant Hauck avers that officers were required to police inmates using the microwaves in the same manner as they policed inmates in other common areas. It is also undisputed that no officers were stationed at the microwave, nor witnessed the attack on Plaintiff. Even if the officers on duty had violated the microwave policy or other prison directive by failing to monitor Price while she was heating the water, "a violation of prison policy 'is insufficient by itself to support an argument for deliberate indifference [,]' *Bracey v. Pennsylvania Dept. of Corrections*, 571 Fed. App'x. 75, 79 (3d Cir. Jul. 2, 2014) (citing *Longoria v. Texas*, 473 F.3d 586, 593 n. 9 (5th Cir. 2006)). Further, the fact that there were two assaults using water heated in the microwave over a number of years does not suggest that Defendants' failed to adequately respond to a *pattern* of occurrences and should have, for instance, stationed an officer at the microwave at all times. Nor can the risk of water heated in

25

the microwave be said to have created a risk "so great and so obvious" that the Administrator Defendants must have known of the excessive risk but were indifferent to it, especially when weighed against the benefits of permitting inmates the use of the microwave to cook their own food.

Plaintiff additionally claims in her brief (but not in her pleadings) that "the policy at [EMCFW] is to be 'reactive' and not 'proactive' (Pl. Br. At 8) with respect to threats of inmate assault.[9]  As evidence of this "policy," she contends that correctional officers, as well as Adams and Hauck, told her that nothing could be done about Price's threats until Price "did something."[10]  Plaintiff undermines her position, however, by testifying that another inmate who complained about Price was moved out of the unit shortly before the attack.  (Pl. Dep. Tr. 78:10-79:18.)

To rebut Plaintiff's claims, the Administrator Defendants have laid out in detail EMCFW's official policies and procedures for using classification, mishousing, and custody to avoid conflicts among inmates. (SOMF ¶¶ 14-19.) Defendants further aver that Plaintiff has been intentionally mishoused to address concerns about her safety.  (SOMF ¶¶13, 20.)  Even if EMCFW officials told Plaintiff that nothing could be done for her until Price "did something," such statements, if limited to Plaintiff's individual case, would be insufficient to establish a policy or custom.  *See, e.g.*, *Williams v. Guard Bryant Fields*, 535 Fed. App'x. 205, 211-12 (3d Cir. 2013); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824, 105 S.Ct. 2427, 2437, 85

---

[9] From the outset, I note that I am not required to consider arguments not raised in the pleadings. *See  Bereczki v. Mansfield Twp.*, No. 03–276, 2005 WL 3454297, at *8 (D.N.J. Dec.13, 2005) ("claim was not alleged in the complaint and cannot be raised for the first time in an opposition to a motion for summary judgment").

[10] Plaintiff also offers testimony from corrections officers in response to out-of-context questions about the terms "proactive" and "reactive," but that testimony is confusing and sheds little if any light on the issue.

L.Ed.2d 791, 804 (1985).  Although Plaintiff's averment that two EMCFW Administrators told

her that nothing could be done about Price's threats until Price "did something" is troubling,

Plaintiff has not presented sufficient evidence from which a jury could conclude that this

"reactive" stance was taken in other instances.  Without evidence of similar conduct and

statements preceding other attacks, Plaintiff cannot establish that this ostensible "policy" actually

existed.  Therefore, should this case proceed to trial, Plaintiff may not pursue this theory against

the remaining defendants.

### 2.  <u>Denial of Medical Care</u>

The Eighth Amendment proscription against cruel and unusual punishment also requires

that prison officials provide inmates with adequate medical care.  *See Estelle v. Gamble*, 429

U.S. 97, 103–04 (1976); *Rouse v. Plantier*, 182 F.3d 192 (3d Cir. 1999).  In order to withstand

summary judgment on denial of medical care claim, an inmate must demonstrate: (1) a serious

medical need; and (2) behavior on the part of prison officials that constitutes deliberate

indifference to that need.  *See Estelle*, 429 U.S. at 106; *Natale v. Camden Cnty. Corr. Facility*,

318 F.3d 575, 582 (3d Cir. 2003).

To satisfy the first prong of the *Estelle* inquiry, the inmate must demonstrate that his

medical needs are serious.  "Because society does not expect that prisoners will have unqualified

access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment

violation only if those needs are 'serious.'"  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  The

Third Circuit has defined a serious medical need as: (1) "one that has been diagnosed by a

physician as requiring treatment;" (2) "one that is so obvious that a lay person would recognize

the necessity for a doctor's attention;" or (3) one for which "the denial of treatment would result

in the unnecessary and wanton infliction of pain" or "a life-long handicap or permanent loss."

*Atkinson v. Taylor*, 316 F.3d 257, 272–73 (3d Cir. 2003) (internal quotations and citations omitted); *see also Monmouth Cnty. Corr. Institutional Inmates*, 834 F.2d 326, 347 (3d Cir. 1987).

The second element of the *Estelle* test requires an inmate to show that prison officials acted with deliberate indifference to his serious medical need. *See Natale*, 318 F.3d at 582 (finding deliberate indifference requires proof that the official knew of and disregarded an excessive risk to inmate health or safety). "Deliberate indifference," in the denial of medical care context, is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. *See Farmer*, 511 U.S. at 837–38. Deliberate indifference may be shown by an official "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed," *Estelle*, 429 U.S. at 104–105, and where "the prison official . . . prevents a prisoner from receiving needed or recommended medical treatment." *Dykeman v. Ahsan*, 560 F. App'x 129, 132 (3d Cir. 2014) (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)). A prisoner's subjective dissatisfaction with his medical care, however, does not in itself indicate deliberate indifference. *See Andrews v. Camden County*, 95 F.Supp.2d 217, 228 (D.N.J. 2000). Notably, non-medical personnel are generally entitled "to presume the competence of medical staff in treating a prisoner. . . ." *Davis v. Superintendent of Somerset SCI*, No. 14–3746, 2015 WL 75260, at *2 (3d Cir. Jan 7, 2015) (citing *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). Thus, Eighth Amendment claims against non-medical personnel based on an unmet need for medical care are limited to circumstances where the non-medical personnel had "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Spruill*, 372 F.3d at 236; *see also Barkes*, 766 F.3d at 327.

28

Here, Plaintiff's claims that Defendant Salvatore denied her access to over-the-counter lotions and soap to treat her burns do not rise to the level of a constitutional violation and, as such, do not survive summary judgment.  It is undisputed that Plaintiff was transported by helicopter to Saint Barnabas Hospital and received prompt and continuing treatment for her burn injuries.  Plaintiff's burn injuries are unquestionably serious and by all accounts were treated accordingly; however, the denial of a specific brand or type of lotion and soap that could be purchased from the commissary does not give rise to an Eight Amendment claim and at best amounts to disagreement over the proper course of treatment.  *See White v. Napoleon*, 897 F.2d 103, 110 (3d Cir.1990) (mere disagreements over medical judgment do not state Eighth Amendment claims); *see also Capetillo v. PrimeCare Medical, Inc.*, No. 14–02715, 2014 WL 5393992, at *3 (E.D. Pa. Oct. 23, 2014) (denial of brand name medication does not amount to deliberate indifference).  Furthermore, even if the request for cocoa butter and Dove soap for her burn injuries could be construed as a serious medical need, Defendant Salvatore had no reason to believe that he should not defer to the physician treating Plaintiff at EMCFW.  Accordingly, summary judgment is granted on Plaintiff's claim against Defendant Salvatore for denial of medical care.

### D. <u>Qualified Immunity</u>

I address qualified immunity only for the surviving failure to protect claims against individual Defendants Adams and Hauck.  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ray v. Twp. of Warren*, 626 F.3d 170, 173 (3d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009)).  In deciding whether a governmental

29

official is entitled to qualified immunity, a court examines: (1) whether the facts alleged make

out a violation of a constitutional right; and (2) if so, whether the right at issue was "clearly

established" at the time of the defendant's alleged misconduct. *See Pearson*, 555 U.S. at 232.

Courts are permitted to address either prong of the analysis first in light of the circumstances at

hand. *See id.* at 236. The defendant bears the burden to prove qualified immunity. *See Thomas*

*v. Independence Twp.*, 463 F.3d 285, 292 (3d Cir. 2006) (citation omitted).

      In light of the Supreme Court's decision in *Pearson*, I focus on the second step, which is:

"whether the right that was violated was clearly established." Here, there is no question that the

Plaintiff's constitutional right to not be physically assaulted while incarcerated was clearly

established at the time of Price's attack of Plaintiff. *See Farmer*, 511 U.S. at 833–34. The

doctrine of deliberate indifference was also clearly established at the relevant time, as *Farmer*

establishes a prison official's duty to protect prisoners from violence at the hands of other

prisoners when a distinct heightened risk of harm is known. *Beers–Capitol*, 256 F.3d at 144.

      As such, summary judgment is denied as to Defendants Adams and Hauck on the basis of

qualified immunity. *Accord Beers–Capitol*, 256 F.3d at 142 ("[T]o the extent that the plaintiffs

have made a showing sufficient to overcome summary judgment on the merits, they have also

made a showing sufficient to overcome any claim to qualified immunity.")

**E.  Punitive Damages**

      Finally, Defendants seek to dismiss Plaintiff's claim for punitive damages on the grounds

that there is no evidence that their conduct involved reckless or callous indifference to Plaintiff's

rights. Individual public officers are liable for punitive damages under § 1983 for their

misconduct on the same basis as other individual defendants. *See Smith v. Wade*, 461 U.S. 30,

35 (1983). The decision to award punitive damages, however, is generally a jury question. *See*

*Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 269–70 (1981).  Malicious intent is not a prerequisite for the award of punitive damages under § 1983. *Smith*, 461 U.S. at 51.  Rather, "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct . . . involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56; *see also Springer v. Henry*, 435 F.3d 268, 281 (3d Cir. 2006) (holding that a jury may award punitive damages where the defendant's conduct violating plaintiff's constitutional rights is reckless or callous).  "The focus is on the character of the tortfeasor's conduct – whether it is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards.  If it is of such a character, then it is appropriate to allow a jury to assess punitive damages." *Smith*, 461 U.S. at 54.

As explained above, to establish deliberate indifference liability under § 1983 on Plaintiff's Eighth Amendment claim, the jury must find that one or both of the remaining Defendants was subjectively reckless, i.e., that the defendant "disregard a risk of harm of which he is aware." *Farmer*, 511 U.S. at 837.  As such, dismissal of the claim for punitive damages at this juncture would be premature.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  Specifically, summary judgment is granted on the official capacity claims against all Defendants, and on Plaintiff's denial of medical care claim against Defendant Salvatore.  The Court grants summary judgment on Plaintiff's Eighth Amendment and state law claims against Defendants Hayman and Salvatore, but denies summary judgment on these same claims against Defendants Hauck and Adams because there exist genuine issues of material fact, and they are not entitled to qualified immunity at this stage.  Defendants' request for summary

31

judgment on Plaintiff's claim for punitive damages is also denied.   An accompanying Order will be entered.

It is on the 11th day of March, 2015

s/Freda L. Wolfson

Freda L. Wolfson

United States District Judge